# United States District Court
## District of New Jersey

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL COMPLAINT** |
| v. | : | |
| **ALEXANDER BRAZHNIKOV, SR.** | : | Magistrate No. 15-3519 |

I, Chetwyn M. Jones, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached page and made a part hereof.

_____
Chetwyn M. Jones, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

March 10, 2015                             at    Newark, New Jersey
Date                                               City and State

Honorable Mark Falk
United States Magistrate Judge                   _____
Name & Title of Judicial Officer                 Signature of Judicial Officer

## **ATTACHMENT A**

### Count One
### Conspiracy to Commit Money Laundering

From in or about January 2008 through in or about September 2014, in Union County, in the District of New Jersey and elsewhere, the defendant ALEXANDER BRAZHNIKOV, SR., together with others, did knowingly and intentionally conspire and agree with each other and with others to transmit and transfer monetary instruments and funds from a place outside the United States, to wit, Russia, to a place in the United States, to wit, New Jersey, with the intent to promote the carrying on of specified unlawful activity, namely the smuggling of electronics components from the United States contrary to Title 18, United States Code, Section 554(a), and contrary to Title 18, United States Code, Section 1956(a)(2)(A), in violation of Title 18, United States Code, Section 1956(h).

### Count Two
### Conspiracy to Smuggle Goods from the United States

From in or about January 2008 through in or about September 2014, in Union County, in the District of New Jersey and elsewhere, the defendant ALEXANDER BRAZHNIKOV, SR., together with others, did knowingly and intentionally conspire and agree with each other and with others to fraudulently export and send from the United States merchandise, articles, and objects, including electronics components, contrary to Title 13, United States Code, Section 305, and to receive, conceal, buy, sell and in any manner facilitate the transportation, concealment, or sale of such merchandise, articles and objects, prior to exportation, knowing the same to be intended for exportation, contrary to Title 18, United States Code, Section 554(a).

In furtherance of the conspiracy and to effect its unlawful objects, the above-listed defendant and his co-conspirators committed and caused to be committed the following overt acts, among others, in the District of New Jersey and elsewhere, as set forth in Attachment B below, in violation of Title 18, United States Code, Section 371.

**ATTACHMENT B**

I, Chetwyn M. Jones, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and other pertinent items of evidence. Where statements of others are related herein, they are related in substance and in part. Because this complaint is being submitted for a limited purpose of establishing probable cause to support the issuance of a complaint and arrest warrant, I have not necessarily included each and every fact that I know or that other law enforcement agents know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the day alleged.

## The Defendant

1. The defendant ALEXANDER BRAZHNIKOV, SR., is the owner, chief executive officer, and principal operator of a privately held, Russian business entity identified as ABN UNIVERSAL, a microelectronics import/export company located in Moscow, Russia.

## The Co-Conspirators

2. Alexander Brazhnikov, Jr., aka "Alexandre Brajnikov" (hereinafter, "Alexander Brazhnikov, Jr."), is the owner, chief executive officer, and principal operator of the following privately held, New Jersey business entities: (a) ABN Universal, Inc., a microelectronics export company formerly located in Carteret, NJ; (b) Zond-R, Inc., a microelectronics export company with its principal place of business in Union, NJ; (c) Telecom Multipliers, a microelectronics export company with its principal place of business in Mountainside, NJ; and (d) Electronics Consulting, Inc., a microelectronics export company with its principal place of business in Manalapan, NJ (hereinafter, these business entities are collectively referred to as the "NJ Export Companies").[1]

---

[1] ALEXANDER BRAZHNIKOV, JR., aka "Alexandre Brajnikov," and the NJ Export Companies were previously charged in connection with the sealed criminal matter of United States v. Alexander Brazhnikov, et al., Mag. No. 14-3677 (MF).

1

## Summary of Investigation

3.  Defendant ALEXANDER BRAZHNIKOV, SR., Moscow-based ABN Universal, Inc., and co-conspirators Alexander Brazhnikov, Jr., and the NJ Export Companies, together with others known and unknown (hereinafter, collectively, the "Subjects"), are part of an illicit, sophisticated, international electronics procurement network that is designed to surreptitiously acquire large quantities of electronic components from United States manufactures and vendors, and to export those parts to Russia, on behalf of Russian business entities that are authorized to supply those parts to the Ministry of Defense of the Russian Federation, as well as the Federal Security Service of the Russian Federation (the "FSB"). Over approximately the last four years, this network has unlawfully obtained and exported over $65 million worth of electronics from the United States to Russian business entities in violation of export control laws, as further described herein.

4.  An investigation conducted by the FBI beginning in or about December 2012 has revealed that defendant ALEXANDER BRAZHNIKOV, SR., through Moscow-based ABN Universal, was responsible for obtaining initial requests for quotes for U.S. electronics components from various Russian entities, including licensed defense contractors. Those requests were then communicated by defendant ALEXANDER BRAZHNIKOV, SR. and the Subjects' Moscow-based network either directly to U.S. vendors by electronic means or by sending the requests to their co-conspirators in the U.S. Using the NJ Export Companies, the Subjects finalized the purchase and acquisition of the requested components from the various U.S.-based distributors. In order to make these purchases, however, the Subjects concealed the true identity of the ultimate end-user[2] of the components in Russia. Upon receipt of the components at the NJ Export Companies' locations, the Subjects re-packaged and prepared the parts for export to Russia via various shipping companies based in New York and New Jersey. In violation of U.S. export control laws, the Subjects routinely and systematically falsified the true value of the exported items on shipping documents in order to evade the legal requirement of filing an Electronic Export

---

[2] The U.S. Department of State ("DOS") and the U.S. Department of Commerce ("DOC") require that certain forms (*i.e.*, 'end-user agreements') be properly executed in connection with the export of controlled items. The DOS requires a completed form DSP-83 be included as a part of an application for authorization to export significant military equipment and classified equipment or data. *See*, 22 C.F.R. §§ 123.10(a), 124.10 and 125.7. The form DSP-83 must be completed by the appropriate foreign persons (*e.g.*, consignee, end-user, government) and forwarded to the DOS through the U.S. person/entity making the application. The DOC requires that a completed form BIS-711 ("Statement by Ultimate Consignee and Purchaser") be included as part of an application for authorization to export certain controlled items, subject to the parameters of 15 C.F.R. §§ 748, et. seq.

2

Information ("EEI") via the Automated Export System ("AES"),[3] thereby concealing their export activities from the United States.

5.   In addition to falsifying the value of the parts they exported, the Subjects purposefully concealed the true destination of the parts they were exporting by directing that the shipments be sent to various recipients and addresses in Russia which were controlled by the Moscow-based network. Specifically, an exhaustive review of banking records, purchase invoices, and shipping documents recovered in this investigation has identified approximately 1,670 shipments directed by the Subjects to locations in Russia over approximately the last four years. Significantly, all of the shipments sent to the various named recipients in Russia have been traced to a total of twelve unique addresses in Moscow. These addresses are all located within six miles of one another, and law enforcement agents have confirmed that none of the addresses hosts any entity that could be described as a manufacturer, distributor, dealer, or any entity actually affiliated with the business of acquiring, shipping or selling electronics components. In fact, several of the addresses have been identified as vacant apartments or storefronts. Additionally, of the remaining shipments identified during this timeframe that were initially addressed to recipients in Finland or Germany, law enforcement agents have traced the final destination of those shipments to one of the twelve known Moscow addresses. Based on these facts, and other information obtained during this investigation, law enforcement agents have confirmed that each of the twelve addresses contained in the six mile radius in Moscow were actually shell entities established at the direction of defendant ALEXANDER BRAZHNIKOV, SR., and utilized by the Subjects as part of their ongoing, illicit procurement of U.S. electronics components. All shipments initially directed to the twelve shell addresses were, in fact, re-directed to a central warehouse controlled by defendant ALEXANDER BRAZHNIKOV, SR. and the Subjects' Moscow-based network. The use by the Subjects of these recipient shell entities further enabled the Subjects to falsify the true end-user of the electronics components they obtained from U.S. vendors and subsequently exported to Russia.

6.   As further detailed herein, funds for these illicit transactions were obtained from the various Russian purchasers, which were deposited into one of

---

[3] Criminal penalties for unlawful export information activities as they pertain to EEI's (formerly known as Shipper's Export Declaration ("SED") forms) are prescribed by 13 U.S.C. § 305. Generally, a DOC Form 7525-V (referred to herein as an "SED Form") is required for all shipments sent to foreign countries regardless of the method of transportation, subject to certain restrictions. As it applies to the instant investigation, SED forms must be filed when: (i) an item requires an export license; (ii) is bound for an embargoed country; or (iii) the value of the item(s) is greater than $2,500 (U.S.). SED forms are electronically filed with the DOC through the AES.

3

the Subjects' primary Russia-based accounts. Disbursements for purchases were made from that primary Russian account through one or more foreign accounts held by "shell" corporations in the British Virgin Islands ("BVI"), Latvia, Marshall Islands, Panama, Ireland, England, United Arab Emirates, and Belize, and ultimately into one of the Subjects' U.S.-based accounts. The Subjects transferred monies from the U.S. to Russia in the same fashion. The creation and use of dozens of shell companies at the direction of defendant ALEXANDER BRAZHNIKOV, SR. and the Subjects was intended to conceal the true sources of funds in Russia, as well as the identities of the various Russian defense contracting firms who were receiving U.S. electronics components.

## Financial Records

7. Documents seized by FBI personnel pursuant to a court-authorized search warrant for an e-mail account used by Alexander Brazhnikov, Jr. included a computer-generated spreadsheet. This spreadsheet contained accounting records for at least 28 separate bank accounts in four different countries (U.S., Russia, Germany, and Cyprus). Additional documents, correspondence, e-mail communications, and information obtained by law enforcement personnel have confirmed that ALEXANDER BRAZHNIKOV, SR. and Alexander Brazhnikov, Jr. had direct access and/or control over each of these accounts. As explained further below, from in or about 2010 through the present, the accounts were consistently funded by incoming wire transfers from over 50 different overseas shell corporations.

8. According to FBI analysis, from July 2010 to February 2014, approximately $65,000,000 in wire transfers passed between the 28 accounts and the foreign shell companies. Upon receipt of the wire transfers to the Subjects' U.S.-based accounts, banking records show that the Subjects routinely made purchases of U.S.-based electronic components for subsequent export to Russia.

9. Significantly, one of the Russian bank accounts (hereinafter, the "Funding Account") has been identified as the primary account from which each of the wire transfers were initiated through the overseas shell companies to the defendants' U.S.-based accounts in 2013. Seized accounting records indicate that during the 2013 fiscal year, over $15,000,000 was wire transferred from the Funding Account to the shell companies. Each of the wire transfers sent from the Funding Account to a given shell company corresponded to a subsequent wire transfer from the shell company to one of the defendants' business accounts in New Jersey. These records show that the Funding Account is the primary funding and operations account for the financial network the Subjects used to conduct their illicit export activities.

4

10.     Further analysis of the spreadsheet and banking records has revealed that deposits into the Funding Account came from multiple sources, including numerous Russian businesses that are authorized to supply electronic components and parts to the Ministry of Defense of the Russian Federation and the Federal Security Service of the Russian Federation (the "FSB"). Other Russian companies making deposits into the Funding Account were involved in the design of nuclear warheads, as well as nuclear weapons strategic and tactical platforms.

11.     Seized documents and banking records[4] have revealed the following partial list of at least fourteen known entities that have made significant deposits to the Funding Account, and that have been confirmed as authorized and/or licensed contractors for the Russian military and intelligence services:

   a.   Imotek: A Russian company authorized to supply parts to the Ministry of Defense of the Russian Federation;
   b.   VNIIA: Also known as "All Russia Research Institute of Automatics," a Russian institute involved in the development of nuclear weapons for strategic and tactical platforms and firing and neutron initiation systems for nuclear weapons;
   c.   VNIITF: Russia's second nuclear warhead design institute;
   d.   Zao Atlas-Kard: A Russian company authorized to supply parts to the FSB;
   e.   Zao Besant: A Russian company authorized to supply parts to the FSB;
   f.   Zao Protection Group Jutta: A Russian company authorized to supply parts to the FSB;
   g.   OAO Scientific and Production Association: A Russian company authorized to supply parts to the FSB;
   h.   OAO Instrument Plant Tensor: A Russian company authorized to supply parts to the FSB;
   i.   OOO Ancud: A Russian company authorized to supply parts to the FSB;
   j.   FGUP Eleron: A Russian company authorized to supply parts to the FSB;
   k.   OOO O.P.T.: A Russian company authorized to supply parts to the FSB;
   l.   Avionika VPK: A Russian company authorized to supply parts to the Ministry of Defense of the Russian Federation;

---

[4] Accounting records and other documents seized in this case contained both English and Russian language notations. The names of the Russian companies used in this affidavit have been translated from Russian to English.

  m. <u>CTU STC</u>: A Russian manufacturer of vehicles, antennas, tracking devices, and communication equipment for the Ministry of Defense of the Russian Federation and the FSB; and

  n. <u>VEKTOR</u>: A Russian company with licenses from the FSB to provide components for the communication networks of Russian nuclear facilities.

12. As stated, analysis of the Funding Account indicates that over $15,000,000 was wire-transferred from this account to the shell companies in 2013 alone. As monies were wire-transferred from the Funding Account to a given shell company, a subsequent wire transfer was found from the shell company to one of the Subjects' export business accounts in New Jersey.

13. For example, in or about January 2013, the Funding Account received approximately $350,000 by Imotek, a licensed supplier of electronics parts for the Russian military. On or about February 13, 2013, the Funding Account wire-transferred $250,000.00 to Smoky Hills S.A., a shell company located in the Marshall Islands. Bank records indicate that on or about February 13, 2013, one of the Subjects' NJ bank accounts received a wire transfer from Smoky Hill S.A. in the amount of approximately $250,000.00. The Subjects then utilized funds in that account to make subsequent purchases of electronics parts, which were then exported to a Moscow address controlled by the Subjects' Russia-based network.

14. Similarly, on or about December 18, 2013, the Funding Account received a deposit of approximately $34,515 from Avionika VPK, a Russian-based supplier of electronics for the Russian military. On or about December 20, 2013, one of the NJ Export Company accounts received a deposit in the amount of approximately $188,500 from a shell company identified as Moriksen AG. Documents recovered during this investigation included a December 2013 invoice to Avionika VPK from ABN Universal for a quantity of 1050 Triquint TGA-2525 filters (the "Triquint Filters") for a total of $34,515, as well as a packing list dated January 10, 2014, indicating that the NJ Export Companies obtained and exported the Triquint Filters to the Subjects' Moscow-based network. Accordingly, these records confirm that the Funding Account was utilized by the Subjects to secretly send funds from Russia, through a shell corporation, to the U.S. in order to facilitate the Subjects' purchase and export of goods on behalf of a Russian company licensed to supply goods to the Russian military.

15. Additionally, the Funding Account was funded over two hundred times in 2013, for a total of approximately $710,716, by CTU STC, a licensed supplier of electronics parts for the Russian military and FSB. A review of the Funding Account has revealed that CTU STC funds were dispersed by the Subjects

through shell companies located worldwide to the Subjects' bank accounts in New Jersey, and that these funds were used to make subsequent purchases of electronics components. For example, on or about March 14, 2013, a shell company identified as Pevoni Holdings LTD ("Pevoni"), located in Tortola, BVI, received a wire transfer in the amount of $150,000 from the Funding Account. Subsequently, one of the Subjects' NJ bank accounts received a wire transfer from Pevoni in the same amount. Thereafter, from on or about March 15, 2013, through on or about March 26, 2013, the Subjects used the same NJ bank account to order electronics components from two U.S. electronics vendors, totaling approximately $124,129. Similarly, on or about March 20, 2013, a shell company identified as Lentar, Ltd. ("Lentar"), located in Belize City, Belize, received a wire transfer in the amount of approximately $248,000 from the Funding Account. Subsequently, one of the Subjects' NJ bank accounts received a wire transfer from Lentar in the same amount. Thereafter, from on or about March 26, 2013, through on or about April 30, 2013, the Subjects used the same NJ bank account to order electronics components from a U.S. electronics vendor totaling $240,623.

16. Law enforcement has also confirmed through various sources, including an in-depth review of court-authorized, intercepted communications, that requests for, and confirmations of, funding activities for the network's operations were often communicated via e-mail by and between defendant ALEXANDER BRAZHNIKOV, SR. and Alexander Brazhnikov, Jr.

17. For example, on or about June 11, 2013, defendant ALEXANDER BRAZHNIKOV, SR. sent an e-mail to Alexander Brazhnikov, Jr. to confirm that a wire transfer had been made from the Russian Funding Account to a NJ Export Company bank account in the amount of $184,500. A review of the banking records for the NJ Export Company has confirmed that the account received a wire transfer in the same amount from one of the foreign shell companies established at the direction of ALEXANDER BRAZHNIKOV, SR. The Subjects then utilized funds in that account to make subsequent purchases of electronics parts, which were then unlawfully exported to a Moscow address controlled by the Subjects' Russia-based network.

18. Similarly, on or about November 11, 2013, defendant ALEXANDER BRAZHNIKOV, SR. sent an e-mail to Alexander Brazhnikov, Jr. to confirm that a wire transfer had been made from the Russian Funding Account to a NJ Export Company bank account in the amount of $195,300. A review of the banking records for the NJ Export Company has confirmed that the account received a wire transfer in the same amount from one of the foreign shell companies established at the direction of ALEXANDER BRAZHNIKOV, SR. The Subjects then utilized funds in that account to make subsequent purchases of electronics

parts, which were then unlawfully exported to a Moscow address controlled by the Subjects' Russia-based network.

19. As stated, the Subjects used the funding from the shell companies to purchase millions of dollars of electronic components, electronic parts, and related items from U.S. manufacturers and U.S. distributors, many of which were subsequently exported to Russia at fraudulently diminished values, as further described below.

## Illegal Export Activities

20. Over approximately the last four years, law enforcement agents have identified approximately 1,923 separate export shipments originated by the Subjects in the U.S. The majority of these overseas shipments were facilitated through a shipping company located in Melville, NY (hereinafter, the "SC"). Significantly, of the identified exports shipped in this timeframe, law enforcement officers have been unable to identify a single corresponding EEI form for an SC shipment of an export originated by the Subjects.

21. Presumably, the absence of EEI forms for those shipments would indicate the vast majority of the Subjects' exports during this timeframe would have had a value of less than $2,500. However, agents have discovered numerous occasions where the Subjects knowingly falsified shipping documents to devalue the true worth of their exports. Examples of the Subjects' attempts to conceal their illicit procurement activities are further described below.

22. Law enforcement officers have obtained and reviewed numerous invoices for purchases made by the Subjects from a semiconductor manufacturer located in Newbury Port, Massachusetts (hereinafter, "SM"). Specifically, on or about March 4, 2013, records reveal that the Subjects purchased three SM microchips containing part number CY7C253KV18-500BZC (the "Microchips"), for a total price of $1,326.99. The Subjects' purchase of the Microchips was funded through a credit card in Alexander Brazhnikov, Jr.'s name, and the invoice directed that SM ship the items to the NJ Export Companies.

23. Agents subsequently obtained a shipping invoice from SC, dated March 6, 2013, containing the details of a shipment sent from the Subects to an address in Moscow, under the attention of "Siminovsky Val 12/66," which has been identified as one of the twelve shell addresses controlled by defendant ALEXANDER BRAZHNIKOV, SR. and the Subjects' Moscow-based network. The packing list for the shipment contained a line item for the Microchips with a listed value of $5.15 total (or approximately 0.38% of the parts' actual value based on information obtained via open source law enforcement databases). The shipment contained additional line item entries for other electronics

8

components, and the Subjects prescribed a total value of $154.45 for all of the goods contained in the shipment.

24. A further review of the additional items contained in the March 6, 2013 shipment, however, revealed similar devaluation of the true cost of the items contained therein. In fact, every other item listed in that shipment was devalued by the same 0.38% factor. Accordingly, law enforcement agents have concluded that the true value of the electronics components contained in the March 6, 2013 shipment was approximately $39,000. Significantly, no EEI form accompanied this shipment, in violation of U.S. export laws.

25. Additional invoices and shipping documents recovered from SM and SC, respectively, reveal similarly illicit purchase and export activity. Specifically, on or about March 15, 2013, records reveal that the Subjects purchased quantities of two more SM parts for a total price of $477.90. The Subjects' purchase of these parts was funded through a credit card in Alexander Brazhnikov, Jr.'s name, and the invoice directed that SM ship the items to the NJ Export Companies.

26. Law enforcement officers subsequently obtained a shipping invoice from SC, dated March 21, 2013, containing the details of a shipment sent from the Subjects to a recipient purportedly in Finland, which was ultimately received by defendant ALEXANDER BRAZHNIKOV, SR. and the Moscow-based network through one of their designated shell entity addresses. The packing list for the shipment contained line items for each of the aforementioned SM parts with a listed value of $7.99 total (or approximately 1.67% of the parts' actual value, based on information obtained via open source law enforcement databases). The shipment contained additional line item entries for other electronics components, and the Subjects listed a total value of $1,845.76 for all of the goods in the shipment.

27. A further review of the additional items contained in the March 21, 2013 shipment revealed similar devaluation of the true cost of the items contained therein. In fact, according to a review of open source pricing databases, every other item listed in that shipment was devalued by the same 1.67% factor. Accordingly, law enforcement agents have concluded that the true value of the electronics components contained in the March 21, 2013 shipment was approximately $110,000. Significantly, no EEI form accompanied this shipment, in violation of U.S. export laws.

28. The transactions identified above are indicative of the Subjects' pervasive efforts to intentionally devalue exports in order to evade the necessity of filing an EEI form. By falsifying the value of the electronic components they exported, the Subjects were able to conceal the true scope of their unlawful venture.

9

## FORFEITURE ALLEGATION

The Complaint alleges the following for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 982:

As the result of committing one or more of the money laundering offenses in violation of Title 18, United States Code, Section 1956, alleged in the criminal complaint, defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 982, all property, real and personal, involved in the money laundering offense(s) and all property traceable to such property, including but not limited to the following:

1. Bank Accounts

    a) Up to a total of $2,000,000.00, contained in account number CY29005004820004820731718301 held in the name of "Alexander Brazhnikov" at Hellenic Bank Public Company, Ltd., Nicosia, Cyprus.

    b) $1,879,991.64 previously contained in Sberbank of Russia's interbank or correspondent bank account numbers 0004403077 and 0004169401, held at Deustche Bank Trust Company Americas; and/or account number 8900057610 held at The Bank of New York Mellon; or any other correspondent accounts maintained by Sberbank of Russia at JP Morgan Chase Bank, Wells Fargo, or Bank of America in the United States;

    c) $699,844.43 previously contained in account number 819009806 held in the name of Zond-R, Inc. at HSBC Bank, which was seized on June 26, 2014;

    d) $390,914.92 previously contained in account number 8056936322 held in the name of Zond-R, Inc. at PNC Bank, which was seized on June 26, 2014;

    e) $200,682.16 previously contained in account number 381030608272 held in the name of Zond-R, Inc. at Bank of America, which was seized on June 26, 2014;

    f) $33,569.32 previously contained in account number 4304570199 held in the name of Epsilon Electronics Corporation at TD Bank, which was seized on June 26, 2014;

   g) $9,049.44 previously contained in account number 129970920 held in the name of Telecom Multipliers, Inc. at JP Morgan Chase, which was seized on June 26, 2014;

   h) $427,714.49 previously contained in account number 097-101489 held in the name of "Alexander Brazhnikov" at PNC Investments, LLC, which was seized on October 10, 2014.

   i) $238.53 previously contained in account number 7527912908 held in the name of Telecom Multipliers, Inc. at Capital One Bank, which was seized on October 10, 2014;

   j) $15,595.86 previously contained in account number 7057324583 held in the name of Zond-R, Inc. at Capital One Bank, which was seized on October 10, 2014;

   k) $33,504.89 previously contained in account number 097-101489 held in the name of "Alexander Brazhnikov" at PNC Investments, LLC, which was seized on October 10, 2014; and

   l) $377,522.40 previously contained in account number 5937116 held by Avnet, Inc. at JP Morgan Chase, which was seized on October 10, 2014

If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s):

(1) cannot be located upon the exercise of due diligence;
(2) has been transferred or sold to, or deposited with, a third person;
(3) has been placed beyond the jurisdiction of the Court;
(4) has been substantially diminished in value; or
(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

   All in violation of Title 18, United States Code, Sections 982 and 1956.