RECEIVED
JUL 27 2018
AT 8:30 _____ M
WILLIAM T. WALSH, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA : Hon.
:
v. : Crim. No. 18- 424- WJM
:
ALEXANDER BRAZHNIKOV, SR. : 18 U.S.C. §§ 371 and
a/k/a "Alexander Brazhnikov," : 1956(h)
a/k/a "Alexander Aleksandrovich
Brazhnikov"

## INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges:

### Count One
### (Conspiracy to Commit Money Laundering)

1. At all times relevant to this Indictment:

   a. Defendant ALEXANDER BRAZHNIKOV, SR., a/k/a "Alexander Brazhnikov," a/k/a "Alexander Aleksandrovich Brazhnikov," (hereinafter, "ALEXANDER BRAZHNIKOV, SR.") was a resident of Moscow, Russia, and was the owner, chief executive officer, and principal operator of a privately-held, Russian business entity identified as ABN UNIVERSAL, a microelectronics import/export company located in Moscow, Russia (the "Moscow Network").

   b. Co-conspirator Alexander Brazhnikov, Jr., was a resident of New Jersey. Alexander Brazhnikov, Jr., was the owner, chief executive officer, and principal operator of the following privately-held, New Jersey business entities: (i) ABN UNIVERSAL, INC., a microelectronics export company formerly

located in Carteret, NJ; (ii) ZOND-R, INC., a microelectronics export company with its principal place of business in Union, NJ; (iii) TELECOM MULTIPLIERS, a microelectronics export company with its principal place of business in Mountainside, NJ; and (iv) ELECTRONICS CONSULTING, INC., a microelectronics export company with its principal place of business in Manalapan, NJ (hereinafter, collectively, the "NJ Export Companies").

The International Emergency Economic Powers Act

d. Pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 – 1707, the President of the United States has the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States. Under the IEEPA, the President may declare a national emergency through Executive Orders that have the full force and effect of law.

e. The IEEPA also empowers the U.S. Department of Commerce ("DOC") to issue regulations governing exports. Initially, the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the DOC promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, that contain additional restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. See 15 C.F.R. § 730.02. Although the EAA lapsed on August 17, 2001, pursuant to the authority provided to the President under IEEPA, the President issued Executive Order 13222, that declared a national emergency with respect to the unusual and extraordinary threat to the national

2

security, foreign policy, and economy of the United States in light of the expiration of the EAA. Accordingly, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the present. See, *e.g.*, 82 Fed. Reg. 39,005 (Aug. 16, 2017). Under IEEPA, it is a crime to willfully violate any regulation promulgated thereunder, including the EAR. See 50 U.S.C. § 1705.

f. Pursuant to its authority derived from IEEPA, the DOC reviewed and controlled the export of certain goods and technology from the United States to foreign countries. In particular, the DOC placed restrictions on the export of goods and technology that it determined could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Under IEEPA and the EAR, it was a crime to willfully export, or attempt or conspire to export, from the United States, any item listed on the commercial control list ("CCL") requiring an export license without first obtaining an export license from the DOC. See 50 U.S.C. § 1705(c); 15 C.F.R. § 764.2.

g. The DOC's Bureau of Industry and Security ("BIS") contained a list of names of certain foreign persons – including businesses, research institutions, government and private organizations, individuals and other types of legal persons – that were subject to specific license requirements for the export, re-export, and/or transfer (in-country) of specified items. These persons comprised the Entity List, as enumerated in 15 C.F.R. § 744, Supp. 4.

3

The Entity List specified the license requirements that it imposed on each listed person that were independent of, and in addition to, license requirements imposed elsewhere in the EAR. 15 C.F.R. § 744.1(c) of the EAR prohibited the use of license exceptions for almost all exports and re-exports to listed entities. The Entity List was generally comprised of entities who had engaged in activities that could result in an increased risk of the diversion of exported, re-exported, and transferred (in-country) items to weapons of mass destruction programs. Grounds for inclusion on the Entity List have also included entities whose activities have been deemed contrary to the national security and/or foreign policy interests of the United States (an entity enumerated on the Entity List is referred to herein as a "banned entity").

<u>Electronic Export Information and the Automated Export System</u>

h. The U.S. Census Bureau, Department of Commerce, at all times relevant hereto, through the Foreign Trade Regulations ("FTR"), 15 C.F.R. part 30, required filing of electronic export information ("EEI") through the Automated Export System ("AES"), including through the free internet application AESDirect. The purpose of the FTR was to strengthen the United States' ability to prevent the export of certain items to unauthorized destinations and/or end users because the AES aids in targeting, identifying, and, when necessary, confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b).

i. EEI was required to be filed for, among other things, (a) all exports subject to the EAR that require an export license, regardless of value or destination; or (b) when the value of the goods being exported exceeds $2,500,

4

per Schedule B or harmonized tariff classification code. 15 C.F.R. §§ 30.1(c), 30.2(a)(1) and 758.1(b). The EEI filed in AES was required to contain, among other things, the names and addresses of the parties to the transaction and a description, quantity, and value of the items exported. 15 C.F.R. § 30.6(a). The EEI filed in AES also was required to include the license authority for the export and, when applicable, the Export Control Classification Number ("ECCN") assigned to the goods being exported pursuant to the EAR and 15 C.F.R. § 758.1(a).

### End-User and End-Use Information

j.  End-user and end-use information was often required by United States-based manufacturers and distributors before they would sell controlled or non-controlled goods to re-sellers or exporters. The DOC required that a completed form BIS-711 ("Statement by Ultimate Consignee and Purchaser") be included as part of an application for authorization to export certain controlled items, subject to the parameters of 15 C.F.R. §§ 748, et. seq.

## The Conspiracy

2.  From in or about January 2008 through in or about June 2014, in Union County, in the District of New Jersey and elsewhere, the defendant,

> ALEXANDER BRAZHNIKOV, SR.,
> a/k/a "Alexander Brazhnikov,"
> a/k/a "Alexander Aleksandrovich Brazhnikov,"

did knowingly and intentionally conspire and agree with Alexander Brazhnikov, Jr., and with others to transmit and transfer monetary instruments and funds from a place outside the United States, to wit, Russia, to a place in the United States, to wit, New Jersey, with the intent to promote the carrying on of specified unlawful activity, namely the smuggling of electronics components from the United States, contrary to Title 18, United States Code, Section 554(a), and contrary to Title 18, United States Code, Section 1956(a)(2)(A).

## Object of the Conspiracy

3.  It was the object of the conspiracy for ALEXANDER BRAZHNIKOV, SR. and his co-conspirators to obtain money from Russian sources to purchase large quantities of U.S.-origin electronics components and to unlawfully export those parts to Russia.

## Manner and Means of the Conspiracy

4.  It was a part of the conspiracy that ALEXANDER BRAZHNIKOV, SR., by and through the Moscow Network, obtained initial requests for quotes ("RFQs") for U.S.-based electronics components from various Russian entities, including defense contractors licensed to procure parts for the Russian military, the Federal Security Service of the Russian Federation (the "FSB"),

and Russian entities involved in the design of nuclear weapons and tactical platforms, and communicated those RFQs either directly to United States-based vendors by electronic means or by sending the requests to Alexander Brazhnikov, Jr., and the NJ Export Companies for implementation.

5. It was further part of the conspiracy that through the NJ Export Companies, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators facilitated the illicit purchase and acquisition of the requested components from the various United States-based vendors by concealing the true identity of the ultimate end-user, as well as the intended end-use of the components in Russia.

6. It was further part of the conspiracy that the funds for these illicit transactions were initially obtained by ALEXANDER BRAZHNIKOV, SR. and the Moscow Network from the various Russian purchasers, including Russian defense contracting firms that were authorized to supply electronic components and parts to the Russian military, the FSB, and Russian entities involved in the design of nuclear warheads, as well as nuclear weapons with strategic and tactical platforms.

7. It was further part of the conspiracy that the funds obtained from the various Russian purchasers were deposited and were caused to be deposited by ALEXANDER BRAZHNIKOV, SR. and the Moscow Network into one of the conspirators' primary Russian-based bank accounts (the "Russian Funding Account").

8. It was further part of the conspiracy that ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators

7

caused the creation of dozens of shell companies with bank accounts in the British Virgin Islands, Latvia, Marshall Islands, Panama, Ireland, England, United Arab Emirates, and Belize, for the purpose of conducting financial transactions to facilitate the unlawful export of electronics components to Russia.

9. It was further part of the conspiracy that disbursements for Alexander Brazhnikov, Jr.'s purchases of electronic components in the United States were made from the Russian Funding Account through one or more foreign accounts held by the conspirators' various shell corporations, and ultimately into United States-based accounts held by Alexander Brazhnikov, Jr., and the NJ Export Companies. These disbursements concealed the true sources of funds in Russia, as well as the identities of the various Russian end-users who were unlawfully receiving electronics components made in the United States.

10. It was further part of the conspiracy that approximately $65,000,000 in wire transfers passed through and among the various bank accounts and foreign shell companies controlled by ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators, and that these funds were used to make illicit purchases of United States-based electronic components on behalf of Russian purchasers, including defense contracting firms that were authorized to supply electronic components and parts to the Russian military and the FSB (collectively, paragraphs 1 through 10 are sometimes referred to herein as the "Money Laundering Scheme").

All in violation of Title 18, United States Code, Section 1956(h).

## Count Two

## (Conspiracy to Smuggle Goods from the United States)

1. The allegations set forth in paragraphs 1 and 4 through 10 of Count One of this Indictment are re-alleged and incorporated as if set forth herein.

## The Conspiracy

2. From in or about January 2008 through in or about June 2014, in Union County, in the District of New Jersey and elsewhere, the defendant,

> ALEXANDER BRAZHNIKOV, SR.,
> a/k/a "Alexander Brazhnikov,"
> a/k/a "Alexander Aleksandrovich Brazhnikov,"

did knowingly and intentionally conspire and agree with Alexander Brazhnikov, Jr., and with others to fraudulently export and send from the United States merchandise, articles, and objects, including electronics components, and to receive, conceal, buy, sell and in any manner facilitate the transportation, concealment, and sale of such merchandise, articles and objects, prior to exportation, knowing the same to be intended for exportation, contrary to any law or regulation of the United States, to wit, Title 13, United States Code, Section 305, and Title 18, United States Code, Section 554(a).

## Object of the Conspiracy

3. It was the object of the conspiracy for ALEXANDER BRAZHNIKOV, SR. and his co-conspirators to smuggle electronics components manufactured by U.S.-based corporations from the United States to Russia on behalf of Russian-based purchasers, including defense contractors licensed to procure

parts for the Russian military, the FSB, and Russian entities involved in the design of nuclear weapons and tactical platforms.

## Manner and Means of the Conspiracy

4. It was a part of the conspiracy that, once the NJ Export Companies purchased and received shipments of electronics components facilitated by the Money Laundering Scheme, Alexander Brazhnikov, Jr., and his co-conspirators re-packaged and prepared the parts for export to Russia via various shipping companies based in New York and New Jersey.

5. It was further part of the conspiracy that ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators routinely and systematically falsified the true value of the exported items on shipping documents in order to evade the legal requirement of filing an Electronic Export Information form via the Automated Export System, thereby concealing the full extent of their unlawful export activities from the United States.

6. It was further part of the conspiracy that ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators routinely and systematically concealed the true destination, and therefore, the true end-user of the parts they were exporting, by directing that the shipments be sent to false addresses in Russia that were actually controlled by ALEXANDER BRAZHNIKOV, SR. and the Moscow Network.

7. It was further part of the conspiracy that from in or about January 2010 through in or about June 2014, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators used the NJ Export

10

Companies to complete approximately 1,923 separate export shipments from New Jersey to Russia, the majority of which did not contain the required filing of an Electronic Export Information form on the Automated Export System.

### Overt Acts

8. In furtherance of the conspiracy, and to effect its unlawful object, ALEXANDER BRAZHNIKOV, SR. and his co-conspirators committed and caused to be committed the following overt acts in the District of New Jersey and elsewhere:

    a. On or about March 6, 2013, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators facilitated the export of a shipment of electronics components from New Jersey to a false address in Russia, and evaded the necessity of filing an Electronic Export Information form on the Automated Export System by falsely devaluing the value of the goods contained in the shipment from approximately $38,612.50 to $154.45.

    b. On or about March 8, 2013, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators facilitated the export of a shipment of electronics components from New Jersey to a false address in Russia, and evaded the necessity of filing an Electronic Export Information form on the Automated Export System by falsely devaluing the value of the goods contained in the shipment from approximately $77,155.00 to $154.31.

    c. On or about March 15, 2013, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators facilitated the export of a shipment of electronics components from New Jersey to a false address in Russia and evaded the necessity of filing an Electronic Export Information form

on the Automated Export System by falsely devaluing the value of the goods contained in the shipment from approximately $25,736.66 to $154.42.

   d. On or about March 21, 2013, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators facilitated the export of a shipment of electronics components from New Jersey to a false address in Russia and evaded the necessity of filing an Electronic Export Information form on the Automated Export System by falsely devaluing the value of the goods contained in the shipment from approximately $110,000.00 to $1,845.76.

   e. On or about February 10, 2014, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators facilitated the export of a shipment of electronics components from New Jersey to a false address in Russia and evaded the necessity of filing an Electronic Export Information form on the Automated Export System by falsely devaluing the value of the goods contained in the shipment from approximately $30,000.00 to $154.52.

All in violation of Title 18, United States Code, Section 371.

## Count Three
## (Conspiracy to Violate the IEEPA)

1.  The allegations set forth in paragraphs 1 and 4 through 10 of Count One of this indictment and paragraphs 4 through 8 of Count Two of this Indictment are incorporated and re-alleged as if set forth herein.

### The Conspiracy

2.  From in or about January 2008 through in or about June 2014, in Union County, in the District of New Jersey and elsewhere, the defendant,

> ALEXANDER BRAZHNIKOV, SR.,
> a/k/a "Alexander Brazhnikov,"
> a/k/a "Alexander Aleksandrovich Brazhnikov,"

did knowingly and willfully conspire and agree with Alexander Brazhnikov, Jr., and with others to export from the United States to Russia items under the jurisdiction of the DOC, to wit, electronics components, without first having obtained the required licenses from the DOC, contrary to Title 50, United States Code, Sections 1702 and 1705, and Title 15, Code of Federal Regulations, Section 764.2.

### Object of the Conspiracy

3.  It was the object of the conspiracy for ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators to evade the EAR by supplying controlled electronics components to Russian end-users, including defense contractors licensed to procure parts for the Russian military, the FSB, and Russian entities involved in the design of nuclear weapons and tactical platforms.

13

## Manner and Means of the Conspiracy

4. It was a part of the conspiracy that, using funds obtained through the Money Laundering Scheme, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators purchased electronics components from U.S.-based manufacturers and distributors, and arranged for the export of those goods to false addresses in Russia which were established and controlled by ALEXANDER BRAZHNIKOV, SR. and the Moscow Network.

5. It was further part of the conspiracy that ALEXANDER BRAZHNIKOV, SR., by and through the Moscow Network, would, in turn, distribute the electronics components to Russian defense contractors who were licensed to procure parts for the Russian military, the FSB, and Russian entities involved in the design of nuclear weapons and tactical platforms.

6. It was further part of the conspiracy that ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators exported and caused to be exported electronics components from the United States to Russia knowing that, although licenses were required for such exports, licenses had not been obtained.

7. It was further part of the conspiracy that, to evade the EAR and to conceal Russian government and military end-users, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators concealed and falsified end-use and end-user information in connection with the purchase and export of electronics components.

8.  It was further part of the conspiracy that, in order to obtain electronics components from United States-based manufacturers and suppliers, and to avoid scrutiny by government regulators, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators provided materially false information regarding the NJ Export Companies' true export function, including the submission of false end-user information to manufacturers and suppliers.

### Overt Acts

9.  In furtherance of the conspiracy and to effect its unlawful object, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators committed and caused to be committed the following overt acts in the District of New Jersey and elsewhere:

    a.  On or about October 18, 2012, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators caused the unlicensed export of electronics components obtained from United States manufacturer "A," specifically, power detectors, and fast-settling, logarithmic detectors and controllers, from the United States to Russia.

    b.  On or about October 18, 2012, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators caused the unlicensed export of electronics components obtained from United States manufacturer "B," specifically, miniature power relay equipment, from the United States to Russia.

    c.  On or about October 18, 2012, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators caused the

unlicensed export of electronics components obtained from United States manufacturer "C," specifically, thermistors for overload protection, from the United States to Russia.

  d. On or about November 20, 2013, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators caused the unlicensed export of electronics components obtained from United States manufacturer "D," including high speed, high output current, voltage feedback amplifiers, from the United States to Russia.

  e. On or about April 23, 2014, ALEXANDER BRAZHNIKOV, SR., Alexander Brazhnikov, Jr., and their co-conspirators caused the unlicensed export of electronics components obtained from United States manufacturer "E," specifically, oscillator frequency upconverters, from the United States to Russia.

All in violation of Title 18, United States Code, Section 371.

## Forfeiture Allegations

1. The United States hereby gives notice to ALEXANDER BRAZHNIKOV, SR. that, upon conviction of the charges set forth in Count One, Count Two, and Count Three of this Indictment, the government will seek the entry of a forfeiture money judgment in the amount of $65,000,000 in United States currency (the "Forfeiture Money Judgment"), in accordance with Title 18, United States Code Section 982, which requires any person convicted of any such offense, or conspiracy to commit such offense, to forfeit any and all property, real or personal, which constitutes or is derived from proceeds involved in or traceable to a violation of such offenses (the "Forfeitable Property"), as set forth below:

2. **Bank Accounts**

    a. Up to a total of $2,000,000.00, contained in account number CY29005004820004820731718301 held in the name of "Alexander Brazhnikov" at Hellenic Bank Public Company, Ltd., Nicosia, Cyprus; if and when the funds are repatriated to the United States, they shall be credited towards the Forfeiture Money Judgment; and

    b. $1,879,991.64 previously contained in Sberbank of Russia's interbank or correspondent bank account numbers 0004403077 and 0004169401, held at Deustche Bank Trust Company Americas; and/or account number 8900057610 held at The Bank of New York Mellon; or any other correspondent accounts maintained by Sberbank of Russia at JP Morgan Chase Bank, Wells Fargo, or Bank of America in the United States.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

A TRUE BILL,

FOREPERSON

_____
CRAIG CARPENITO
United States Attorney

18

CASE NUMBER: 18-cr-428-WJM

# United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

ALEXANDER BRAZHNIKOV, SR.,
a/k/a "Alexander Brazhnikov,"
a/k/a "Alexander Aleksandrovich Brazhnikov"

## INDICTMENT FOR
18 U.S.C. §§ 371 and 1956(h)

*A True Bill*

_____
FOREPERSON

**CRAIG CARPENITO**
U.S. ATTORNEY
NEWARK, NEW JERSEY

DEAN C. SOVOLOS
ASSISTANT U.S. ATTORNEY
(973) 297-2014

USA-48AD 8
(Ed. 1/97)